861 F.2d 721
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nancy MAHONEY, Plaintiff-Appellant,
v.
DAYTON WALTHER CORP., Defendant-Appellee.
 No. 87-6222.
 United States Court of Appeals, Sixth Circuit.
 Oct. 31, 1988.
 
 Before WELLFORD and BOGGS, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Mahoney appeals from the grant of summary judgment to her employer, Dayton Walther Corp. (DW), in her suit alleging sex discrimination under Title VII of the Civil Rights Act and intentional infliction of emotional distress under Kentucky law. Mahoney claims three instances of sex-based discrimination by her employer: 1) her employer's refusal to reinstate her to her former position when she returned from maternity leave, even though its formal policy was to make such reinstatements after temporary disability leaves; 2) her employer's creation of an anti-spouse policy preventing her and her husband from working in the same department; and 3) retaliation against her for filing sex discrimination charges.
 
 
 2
 * Mahoney began working for DW as a clerk in September 1977. She received numerous promotions thereafter, and by August 1979, she held the Grade C position of traffic clerk in the shipping/receiving department, at $218 per week. In November 1982, she married a co-worker, Floyd Mahoney. She and Floyd sought and received permission to continue working in the same department before they were married. Mahoney claims that Floyd was never her immediate supervisor; however, DW claims that Floyd was her supervisor for the first five years of her employment with the company.
 
 
 3
 In late 1983, DW hired a new Vice President and General Manager of the Transportation Unit, Mr. Endicott. In June 1984, Mahoney went on maternity leave, and was ready to return to work in August 1984. However, shortly before Mahoney's return, Endicott decreased the clerical staff and combined the duties of three clerks into two. The result of this change was that the Maintenance Clerk/Computer Operator task was assigned to Mahoney's job and this new position directly reported to Floyd, which DW claims violated its business practices. Mahoney claims that Floyd was not the direct supervisor of Mahoney's position because they worked on different shifts. However, she also testified that in July or August of 1984, before she returned to work but after the changes had been instituted, she was told that she would not be transferred because of these changes until she met with management.
 
 
 4
 DW had initiated a no-spouse policy which would prevent Mahoney from returning to the department in which Floyd worked. Mahoney claims that this policy was applied retroactively to her, and that she was the only employee in the company who was affected by this policy. However, there was testimony concerning a Mr. Long, who was transferred to a different department from the one in which his wife worked after he returned from temporary disability leave. (App. 147). Mahoney also claims that there were never any problems as a result of her working with Floyd; however, one employee testified that there had been problems, such as scheduling vacations together and wanting to work the same shifts.
 
 
 5
 DW claims that when its officers met with Mahoney to discuss possible transfers, Mahoney rejected every transfer offer, including two positions which carried higher rankings than the one she held before her maternity leave. Mahoney claims that she rejected these positions only because they would have required her to work a different shift from the one she had worked prior to her pregnancy. Mahoney further claims that DW's officers did not offer to transfer Floyd instead of her until she mentioned the possibility to them. DW claims that Mahoney's eventual transfer was the option to which she voiced the least objection, although it carried a lower ranking.
 
 
 6
 In August 1984, when Mahoney returned to work, she claims to have been required to train her replacement and to perform random odd jobs, although her salary was not decreased. However, the trial court found that her replacement had qualifications equal to hers. She also claims that her inquiries regarding her work status and DW's failure to process her annual raise went unanswered. Mahoney also alleges that the Industrial Relations Manager told her that DW was trying to make her uncomfortable and to "get rid of her." These allegations are not substantiated in the record.
 
 
 7
 In October 1984, Mahoney's replacement was promoted to second shift supervisor and given a salary increase of $146 per week. Mahoney feels that she would have been given this promotion had she not gone on maternity leave. She also alleges that DW failed to give her an annual raise until five months after it was due; and that it was the smallest she had ever received, 3.12%, while other employees received 19-22% raises that year. DW explains this by stating that the company had, in the past, given raises on an employee's anniversary of beginning with the company, but was in the process of changing to a system of giving raises to all employees in January. Thus, they postponed raises to some employees whose anniversaries were too close to January to warrant a raise at both times. DW further contends that Mahoney still works for the company, and that she has gotten a number of raises since 1984, including the highest raise in her department in 1987.
 
 
 8
 Mahoney alleges that DW threatened her and Floyd's jobs if she pursued charges against it. Still, she filed charges with the Kentucky Commission on Human Rights in October 1984, and with the EEOC in July 1985. On July 15, 1985, the EEOC issued a right-to-sue letter to Mahoney, and Mahoney filed suit on October 11, 1985. She claims that she has required medical treatment since she returned from her maternity leave. She contends that her symptoms include headaches, ringing in her ears, depression, nerves, diarrhea, and loss of sleep. She takes prescription medications and is under a doctor's care. Finally, she claims that DW offered her $1000 to drop the charges, but she refused.
 
 
 9
 DW filed a motion for summary judgment on November 30, 1986, which was denied by the trial court. However, the trial judge ruled that trial would commence on the Title VII claims only, reserving the state tort claim for "later." The trial took place on April 14 and 15, 1987. On May 15, 1987, the trial judge agreed to dismiss the Title VII claims, amending the order on June 22, 1987, to include the retaliation claims. DW then renewed its motion for summary judgment on the tort claim, and the trial judge granted that motion on October 2, 1987.
 
 
 10
 In its opinion and order, the trial judge reasoned that precedent supported the validity of anti-spouse policies, finding that such policies are based on sound business judgment. Further, the trial judge opined that the evidence did not show that but for her pregnancy, Mahoney would have received the promotion which ultimately went to her replacement. Thus, the court held that there had been no sex discrimination in the instant case. Therefore, there was no injury on which to base a claim of emotional distress.
 
 II
 
 11
 On appeal, Mahoney argues that, at trial, she satisfied her burden of establishing a prima facie case of discrimination, and that the burden should have shifted to DW to establish its motive for its treatment of her. She further claims that the application of DW's no-spouse policy to her was discriminatory, and that she would have received a promotion but for her maternity leave. In addition, she claims that DW threatened to retaliate against her for filing sex discrimination charges, and that she has suffered great emotional distress as a result of her treatment by DW. Mahoney claims that the trial judge erred in refusing to try the emotional distress claim.
 
 
 12
 * The standard of review of a Title VII case is the usual "clearly erroneous" standard applied in civil cases. "When reviewing the district court's factual findings in a Title VII discrimination case, we may not reverse unless we find that the district court committed clear error." Wrenn v. Gould, 808 F.2d 493, 499 (6th Cir.1987) (citing Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)). " 'If the district court's account of the evidence is plausible ... the court of appeals may not reverse it even though ... it would have weighed the evidence differently.' " Ibid. Furthermore, a state Civil Rights Commission finding of " 'no probable cause' of discrimination should be accorded substantial weight." Ibid. (citing Cooper v. Philip Morris, 464 F.2d 9 (6th Cir.1972)).
 
 B
 
 13
 Mahoney's first claim is that DW intentionally discriminated against her on the basis of sex when it refused to allow her to return to her former position after she returned from maternity leave when DW's standard procedure is to allow employees, after temporary disbility leaves, to return to their former positions. She urges the court to analyze the events according to a disparate treatment theory of sex-based discrimination.
 
 
 14
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court announced four factors to be used as a guide by the federal courts in determining when and whether an employee has made out a prima facie case of discrimination and, thus, of a violation of Title VII, according to disparate treatment theory. The employee must show that the employee: 1) is a member of a protected class; 2) applied and was qualified for the job; 3) was rejected; and 4) that the position remained open and the employer continued to accept applications for the position. Id. at 802. If the employee satisfies this burden, the burden of proof shifts to the employer to show that the employer's decision was motivated by a legitimate, nondiscriminatory purpose. Ibid. Finally, the employee has a final chance to prove discrimination by showing that the nondiscriminatory reason alleged by the employer is merely a pretext designed to disguise the discrimination. Id. at 804.
 
 
 15
 At all stages, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains ... with the plaintiff." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted). The establishment of the prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee." Id. at 254. The employee has to show that "discrimination was the company's standard operating procedure--the regular rather than the unusual practice." Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 (1977).
 
 
 16
 To rebut the prima facie case, the employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Burdine, 450 U.S. at 255. If that burden is satisfied, the "presumption raised by the prima facie case is rebutted...." Ibid. However, it should be kept in mind that "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally," id. at 258 (citing McDonnell Douglas, 411 U.S. at 804); the employer's burden is only of production of evidence, not of persuasion. Id. at 257-58.
 
 
 17
 Once the employer has produced evidence of nondiscriminatory purpose, the plaintiff must have a "fair opportunity to demonstrate that [the employer's] assigned reason for refusing to re-employ was a pretext ...," McDonnell Douglas, 411 U.S. at 807, designed to disguise a true purpose of discrimination. Only if this final step is satisfied has the employee successfully established that the employer's treatment of the employee was discriminatory.
 
 
 18
 In general, this analysis is to be applied in cases in which employees allege intentional sex or race discrimination. The analysis was "never intended to be rigid, mechanical or ritualistic," nor does it "impose a duty to adopt hiring procedures that maximize[] the hiring of minority employees." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577-78 (1978). The one absolute requirement is proof which leads the court to conclude that the employer's "policy denied [the employee] specific employment opportunities that [the employee] otherwise would have obtained." Nashville Gas Co. v. Satty, 434 U.S. 136 (1977).
 
 
 19
 In the present case, Mahoney claims that her pregnancy leave was treated differently than any other temporary disability leave, contrary to the Pregnancy Discrimination Act (PDA), 42 U.S.C. Sec. 2000e-(k). The PDA does provide that pregnancy must be treated the same as any other temporary disability, and that pregnancy discrimination is sex discrimination. Id.
 
 
 20
 Thus, the first question to be decided is whether Mahoney has made out a prima facie case of discrimination under McDonnell Douglas, 411 U.S. 792. She is a member of a protected class, and she is qualified to return to her former position. That much is not disputed. In addition, it is clear that, in fact, she was not allowed to return to her former position, and that she was replaced by another woman who was no more qualified than she. Thus, all of the elements of a prima facie case exist here.
 
 
 21
 The next step, then, is to evaluate the employer's alleged nondiscriminatory reason for refusing to allow Mahoney to return to her former position. Ibid. The employer claims that its actions serve legitimate business purposes. Mr. Endicott was hired as Vice President and General Manager of the Transportation Unit. With the energy and enthusiasm of any newly hired executive, Endicott instituted changes in policies and practices which he hoped would increase productivity and decrease expenses. In that spirit, he established an anti-spouse policy, which was in effect at the time of Mahoney's return. In addition, while she was out on leave, Endicott reorganized his staff, and the position which Mahoney had previously occupied now was directly supervised by Mahoney's husband.
 
 
 22
 Keeping in mind that the employer's burden is merely to produce evidence of a nondiscriminatory purpose rather than to persuade, Burdine, 450 U.S. at 258, the allegations of economic advantage and increased efficiency satisfy DW's burden. Endicott, on behalf of DW, did nothing unusual; nor did his reorganizations affect only Mahoney. Mahoney cannot use her maternity leave to create suspicion about apparently innocent and sensible business practices without a stronger showing of discriminatory motive.
 
 
 23
 Mahoney claims that the alleged business purpose for refusing to return her to her former position is a pretext for discrimination. She claims that her replacement's salary was 36% higher than she previously was paid, and that this indicates that DW did not save any money in reorganizing. She fails to take into account, though, that two jobs were combined into one, so that a 36% raise in salary for her replacement is still less than paying two people her previous salary. Second, she does not acknowledge that this 36% raise did not occur until her replacement was promoted. Thus, it is not that the person in her former position was making 36% more than she did; the person who was in the new position which included her former position, after the promotion, was being paid 36% more. Thus, Mahoney's claim of pretext is unsupported by the facts.
 
 
 24
 Finally, it is difficult to imagine that an employee against whom the employer was intentionally discriminating would be offered four alternative positions in the company, two of which were higher ranked and paid than her former position, or that such an employee would be allowed to take a lower ranked and less demanding job at her former salary. It seems clear here that DW did everything it could to accommodate Mahoney. There is no evidence to support Mahoney's claim.
 
 C
 
 25
 Mahoney analyzes her challenge to the anti-spouse policy under a disparate impact analysis, which is usually employed in class action suits. This analysis is used to examine employment practices which are facially neutral, but which "operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971). Again, the employee must begin by establishing a prima facie case of discrimination, which is usually accomplished through the use of statistical data. Ibid. However, the employee must show more than statistical disparity; the employee must identify "the specific employment practice that is challenged." Watson v. Fort Worth Bank & Trust, 108 S.Ct. 2777, 2788 (1988). In addition, as part of the prima facie case, the employee must prove that the statistics "show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. at 4927.
 
 
 26
 Once the employee has established a prima facie case of discrimination, the employer must show "business necessity": that the challenged practice "bear[s] a demonstrable relation to successful performance of the jobs for which it was used." Griggs, 401 U.S. at 431.
 
 
 27
 Although the employee in a disparate impact case may use statistics to show discrimination, the "statistical disparities must be sufficiently substantial that they raise ... an inference of causation." Watson, 56 U.S.L.W. at 4927. Thus, the court must look at Mahoney's statistical data to determine whether it meets this criterion.
 
 
 28
 Mahoney claims that she is the only employee to whom the anti-spouse rule has ever been adversely applied. That is the extent of her evidence here. However, the record shows that even this is untrue. In fact, apparently, there was one case of a husband who, after a lengthy temporary leave, was transferred to a position in a department apart from his wife. (App. 147).
 
 
 29
 There is simply no substance to Mahoney's claim that the anti-spouse policy in itself, or as applied to Mahoney, amounted to sex discrimination. There is abundant case law to the contrary. In Harper v. Trans World Airlines, Inc., 525 F.2d 409 (8th Cir.1975), the court held that an anti-spouse policy was not sex discrimination. The court said that "statistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded." Id. at 412 (citing Robinson v. City of Dallas, 514 F.2d 1271, 1273 (5th Cir.1975)). In Yuhas v. Libby-Owens Ford Co., 562 F.2d 496, 498 (7th Cir.1977), the Seventh Circuit came to the same conclusion, as did the District of Columbia Circuit, applying constitutional equal protection doctrine rather than Title VII in Cutts v. Fowler, 692 F.2d 138, 141 (D.C.Cir.1982). State courts also have reached this outcome under state anti-discrimination laws. See Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board, 72 A.2d 556, 415 N.E.2d 950, 420 N.Y.S.2d 761 (1980); Kraft, Inc. v. Minnesota Department of Human Rights, 284 N.W.2d 386 (Minn.1979); Washington Water Power Co. v. Wahington State Human Rights Commission, 91 Wash.2d 62, 586 P.2d 1149 (1976).
 
 
 30
 Thus, Mahoney's claim regarding DW's anti-spouse policy is meritless. DW's policy is job related, and appears to be evenly applied; thus, it is not discriminatory on the basis of sex. Mahoney's claim must fail.
 
 D
 
 31
 Mahoney's remaining claims of retaliation and emotional distress also are unsupportable. The first requirement to support a claim of retaliation is to show that the employee "engaged in activity protected by Title VII." Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 375 (6th Cir.1984). The employee must also "show that the adverse action would not have occurred 'but for' the protected conduct." Ross v. Communications Satellite Corp., 759 F.2d 355, 366 (4th Cir.1985). Although Mahoney claims that her job was threatened because she filed charges against DW, there is no substantiation of this in the record. In addition, the action Mahoney complains of--her transfer--occurred long before she filed charges. After filing charges, no adverse action was taken. In fact, Mahoney is still employed by DW. Thus, because there is no evidence that "but for" filing charges against DW, Mahoney would have been treated differently than she has been, her claim of retaliation cannot be maintained.
 
 
 32
 Mahoney's final claim is that interference with her rights under Title VII caused her extreme emotional distress, and that the trial judge erred in disposing of this claim in such a summary fashion. Indeed, she lists symptoms such as sleeplessness and headaches which are characteristic of stress. However, again, because this claim is based on her Title VII claims, and because those claims cannot be substantiated, Mahoney can show no prejudice as a result of the trial judge's decision.
 
 
 33
 "A plaintiff may have a cause of action for emotional distress from the intentional and unlawful interference with her rights, regardless of whether she suffers any bodily injury from such interference." Craft v. Rice, 671 S.W.2d 247, 249 (Ky.1984). Accordingly, by definition, a violation of one's rights is a prerequisite for success in such an action. Because Mahoney has not established a violation of her rights, she cannot state a cause of action for emotional distress. Therefore, Mahoney could not have prevailed on her claim of emotional distress, and, so, she was not prejudiced by the trial judge's ruling on this issue.
 
 III
 
 34
 Mahoney cannot substantiate a claim of sex discrimination on the basis of her treatment upon return from maternity leave, or on the basis of the anti-spouse policy. Because these claims cannot be maintained, her claims of retaliation and emotional distress, both of which are premised on findings of discrimination, must also fail. Therefore, the district court's judgment is AFFIRMED.